# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-11073

United States Court of Appeals
Fifth Circuit

**FILED**

July 22, 2019

Lyle W. Cayce
Clerk

ANTONIO JUBIS ZACARIAS; ROBERTO BARBAR

  Plaintiffs - Appellants

v.

STANFORD INTERNATIONAL BANK, LIMITED

  Defendant

BARRY L. RUPERT; CAROL RUPERT; MICHAEL RISHMAGUE; LIONEL ALESSIO; DAN AULI PANOS, et al

  Movants - Appellants

v.

OFFICIAL STANFORD INVESTORS' COMMITTEE; MANUEL CANABAL; WILLIS, LIMITED; WILLIS OF COLORADO, INCORPORATED,

  Interested Parties - Appellees

WILLIS GROUP HOLDINGS LIMITED; WILLIS NORTH AMERICA, INCORPORATED; AMY S. BARANOUCKY; BOWEN MICLETTE; BRITT, INCORPORATED; RALPH S. JANVEY; SAMUEL TROICE,

  Appellees

v.

EDNA ABLE,

  Interested Party - Appellant

----------------------

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

CONSOLIDATED WITH 17-11114

THE OFFICIAL STANFORD INVESTORS' COMMITTEE; SAMUEL
TROICE, on their own behalf and on behalf of a class of all others similarly
situated; MANUEL CANABAL, on their own behalf and on behalf of a class
of all others similarly situated,

 Plaintiffs - Appellees

v.

CARLOS TISMINESKY; ROBERTO BARBAR; ANA LORENA NUILA DE
GADALA-MARIA,

 Plaintiffs - Appellants

v.

WILLIS OF COLORADO, INCORPORATED; WILLIS LIMITED; WILLIS
GROUP HOLDINGS LIMITED; WILLIS NORTH AMERICA,
INCORPORATED; AMY S. BARANOUCKY; BOWEN, MICLETTE; BRITT,
INCORPORATED,

 Defendants - Appellees

v.

BARRY L. RUPERT; CAROL RUPERT; MICHAEL RISHMAGUE; LIONEL
ALESSIO; DAN AULI PANOS, EDNA ABLE; et al,

 Appellants

v.

RALPH S. JANVEY, in his Capacity as Court-Appointed Receiver for
Stanford Receivership Estate,

 Appellee

2

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

----------------------
CONSOLIDATED WITH 17-11122

EDNA ABLE; ROBERT C. AHDERS; RODRIGO RIVERA ALCAYAGA; DAVID ARNTSEN; CARLIE ARNTSEN; ET AL,

 Plaintiffs - Appellants

v.

WILLIS OF COLORADO, INCORPORATED; WGH HOLDINGS, LTD.; WILLIS LTD.,

 Defendants - Appellees

----------------------
CONSOLIDATED WITH 17-11127

ANTONIO JUBIS ZACARIAS, Individual; ANA VIRGINIA GONZALEZ DE JUBIS, Individual; GLADIS JUBIS DE ACUNA, Individual; ERIC ACUNA JUBIS, Individual; TULIO CAPRILES, Individual; JORGE CASAUS HERRERO, Individual; MARTHA BLANCHET, Individual; LUIS ZABALA, Individual; EMMA LOPEZ, Individual; ELBA DE LA TORRE, Individual,

 Plaintiffs - Appellants

v.

WILLIS LIMITED; WILLIS OF COLORADO, INCORPORATED,

 Defendants - Appellees

----------------------
CONSOLIDATED WITH 17-11128

ANA LORENA NUILA DE GADALA-MARIA, Individual; JOSE NUILA, Individual; JOSE NUILA FUENTES, Individual; GLADYS BONILLA DE NUILA, Individual; GLADYS ELENA NUILA DE PONCE, Individual, et al

 Plaintiffs - Appellants

3

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

v.

WILLIS LIMITED, a United Kingdom Company; WILLIS OF COLORADO, INCORPORATED, a Colorado Corporation

  Defendants - Appellees

----------------------
CONSOLIDATED WITH 17-11129

CARLOS TISMINESKY, Individual; RACHEL TISMINESKY, Individual; FELIPE BRONSTEIN, Individual; ETHEL TISMINESKY DE BRONSTEIN, Individual; GUY GERBY, Individual; VICENTE JUARISTI SUAREZ, Individual; AMPARO MATEO LONGARELA, Individual; SALVADOR GAVILAN, Individual; LARRY FRANK, Individual; MERCEDES BITTAN, Individual; OMAIRA BERMUDEZ, Individual,

  Plaintiffs - Appellants

v.

WILLIS LIMITED; WILLIS OF COLORADO, INCORPORATED,

  Defendants - Appellees

———————————

Appeals from the United States District Court
for the Northern District of Texas

———————————

Before HIGGINBOTHAM, GRAVES, and WILLETT, Circuit Judges.
PATRICK E. HIGGINBOTHAM, Circuit Judge:

The Securities and Exchange Commission filed a complaint in the Northern District of Texas against Robert Allen Stanford, the Stanford International Bank, and other Stanford entities, alleging "a massive, ongoing

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

fraud." Invoking the court's long-held statutory authority, the Commission requested that the district court take custody of the troubled Stanford entities and delegate control to an appointed officer of the court. The court did so, appointing Ralph Janvey as receiver to "collect" and "marshal" assets owed to the Stanford entities, and to distribute these funds to their defrauded investors to honor commitments to the extent the receiver's efforts recouped monies from the Ponzi-scheme players.

The receiver has pursued persons and entities allegedly complicit in Stanford's Ponzi scheme. Through settlements with these third parties, the receiver retrieved investment losses, which it then distributed pro rata to investors through a court-supervised claims process. Four years into this ongoing process, the receiver sued two of Stanford's insurance brokers as participants in the fraudulent scheme. As with the receiver's other suits, monies it recovered from this suit would be distributed by the receiver pro rata to investor claimants. After years of litigation, the insurance brokers, negotiating for complete peace, agreed to settle conditioned on bar orders enjoining related Ponzi-scheme suits filed against the brokers. The district court entered the bar orders and approved the settlements. Certain objectors bring this appeal challenging the district court's jurisdiction and discretion to enter the bar orders. We affirm.

## I.

### A.

The story is well known. Under the operation of Robert Allen Stanford, the Antigua-based Stanford International Bank issued certificates of deposit, (SIB CDs) and marketed them throughout the United States and Latin

5

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

America.[1] Stanford's financial advisors promoted SIB CDs by blurring the line between the Antiguan bank and Stanford's United States-based financial advisors, creating the impression that SIB CDs were better protected than similar investments backed by the Federal Deposit Insurance Corporation. Stanford trained its brokers to assure potential investors that the Bank's investments were highly liquid and achieved consistent double-digit annual returns, all under the protection of extensive insurance coverage.

Here, the receiver alleges that, to support their marketing activities, the Stanford entities purchased insurance policies through their insurance brokers, Bowen, Miclette & Britt, Inc. (BMB) from the 1990s and Willis from 2004. As the receiver describes their role, the Stanford entities then touted insurance policies covering the Bank in its marketing materials. Promotional materials presented the Bank's unique insurance coverage, describing a gauntlet of audits and risk analyses the Bank passed to satisfy its insurers, perpetuating the impression that Bank deposits were fully insured. They were distributed widely and were routinely distributed to Stanford's client base. BMB and later Willis also provided letters of coverage to Stanford financial advisors, often originally drafted by Stanford personnel. These letters described the Stanford International Bank's management as "first class business people," and described how the brokers "placed" Lloyd's of London insurance policies for the Bank. Letters and promotional materials did not disclose the policies' true coverage.

Stanford's marketing efforts succeeded. Insurance played a central role in the Bank's overall attractiveness to investors. Not only prospective investors who directly viewed the brokers' letters, but also the Bank's client base more

---

[1] *United States v. Stanford*, 805 F.3d 557, 563–65 (5th Cir. 2015).

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

generally, were drawn to the combination of relatively high rates of return and purportedly comprehensive insurance coverage. Over two decades, the Bank issued more than $7 billion in SIB CDs to investors.

Maturing CDs were redeemed with new investors' principal payments.[2] Deposits were meanwhile commingled and allocated to illiquid investments, primarily in Antiguan real estate—a portfolio monitored not by a team of professional analysts, but by only two individuals, Robert Allen Stanford and James Davis, the Bank's chief financial officer. BMB and Willis performed insurance assessments on all aspects of Stanford's businesses, such that they enjoyed full understanding of operations. In the process, the brokers learned that SIB CDs financed an illiquid real-estate fund, and that the quality and risk of the underlying investments had not been disclosed to investors. Moreover, the brokers procured policies that provided no meaningful coverage of deposits in the Bank. When the Ponzi scheme collapsed, $7 billion in deposits were protected by $50 million in insurance coverage. Presenting as a legitimate enterprise, it was nothing but a single, massive fraudulent scheme.

**B.**

The Stanford Ponzi scheme collapsed in the wake of the 2008 financial crisis, when the stream of new depositors ran dry.[3] Among the defrauded investors, 18,000 SIB CD holders lost around $5 billion. On February 17, 2009, the SEC filed its complaint against Robert Allen Stanford, the Bank, and other Stanford entities, alleging, inter alia, violations of the Securities Act of 1933, the Securities Exchange Act of 1934 and Rule 10b-5, and the Investment Company Act of 1940. The SEC sought an injunction against continued violations of the securities laws, disgorgement of illegal proceeds of the

---

[2] *Id.* at 564.
[3] *Id.*

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

fraudulent scheme, a freeze of the Stanford assets, and a federal court order placing the Stanford entities into a receivership.

The district court appointed Ralph Janvey as receiver, with authority to take immediate, complete, and exclusive control of the Stanford entities, and to recover assets "in furtherance of maximum and timely disbursement . . . to claimants."[4] The district court's Receivership Order enjoined all persons from "[t]he commencement or continuation . . . of any judicial, administrative, or other proceeding against the Receiver, any of the defendants [in the SEC action, such as Robert Allen Stanford and the Bank], the Receivership Estate, or any agent, officer, or employee related to the Receivership Estate, arising from the subject matter of this civil action," as well as from "[a]ny act to collect, assess, or recover a claim against the Receiver or that would attach to or encumber the Receivership Estate." The district court appointed an examiner to investigate and "convey to the Court such information as . . . would be helpful to the Court in considering the interests of the investors in any financial products, accounts, vehicles or ventures sponsored, promoted or sold by" the Stanford entities, and to serve as chair of the Official Stanford Investors' Committee (the "Investors' Committee") to represent investors in the Stanford International Bank and to prosecute claims against third parties as assigned by the receiver.

The district court approved a process by which Stanford investors, including investors in SIB CDs, could file claims against the Stanford entities with the receiver, and, if approved, participate in distributions of the receivership's assets. The order set a deadline of 120 days for claimants to submit proofs of claim against the receivership entities. The receiver would

---

[4] The 2009 Receivership Order was subsequently amended in 2010 and remained identical in all relevant parts.

8

evaluate the claims, subject to an appeal process and judicial review in the district court. Would-be claimants who failed to submit claims by the deadline were enjoined from later asserting claims against the receivership and its property. The court ordered the receiver to provide notice of the deadline to all "Stanford International Bank, Ltd. certificate of deposit account holders who had open accounts as of February 16, 2009 and for whom the Receiver has physical addresses from the books and records of Stanford International Bank, Ltd." The court also ordered the receiver to publish notice on its website and in the *New York Times*, *Wall Street Journal*, *Financial Times*, *Houston Chronicle*, and newspapers in the British Virgin Islands, Antigua, and Aruba.

Of the Plaintiffs-Objectors, 477 of 509—approximately 94 percent—have and will continue to recover as claimants in the receivership's distribution process.[5] While the record does not reflect why the remaining 32 Plaintiffs-Objectors did not timely submit claims, they constitute less than two-tenths of one percent of the total 18,000 defrauded SIB CD investors. And many of these 32 could not be confirmed as SIB CD investors by the receiver.

## C.

The receiver identified and pursued persons and entities as participants in the Ponzi scheme to recover funds for distribution to investor-claimants. Armed with a receiver's authority to provide total peace, it sued, among others, an accounting firm, BDO USA LLC, ultimately settling the suit for $40 million, the Adam & Reese law firm and other individuals and settling for around $4 million, and consultant Kroll LLC and its affiliate, settling for $24 million. In each of these suits, the district court entered a bar order requested by the parties, enjoining related claims against the defendants arising out of the

---

[5] Of the 509 Plaintiffs-Objectors, 455 are confirmed claimants; 22 are claimants with the Antiguan liquidators and by agreement are treated as claimants by the receiver.

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

Stanford Ponzi scheme. Receivership claimants including Plaintiffs-Objectors with approved claims recovered pro rata from the funds gathered in these receivership actions without challenge to the bar orders.

Five months after the appointment of the receiver, individual investor Samuel Troice and other investors filed a putative class action in the district court on behalf of a class of SIB CD investors against BMB and Willis of Colorado and related entities ("the Original Troice Action").[6] The action sought recovery of their losses from the Ponzi scheme under the Texas Securities Act, theories of negligence and fraud. In 2011, the district court dismissed the case, holding that the claims were precluded by the Securities Litigation Uniform Standards Act (SLUSA). This court reversed in a consolidated appeal,[7] and the Supreme Court affirmed in *Chadbourne & Parke LLP v. Troice*.[8] The Court held that SLUSA's prohibition on state-law class actions alleging fraud in "the purchase or sale of a covered security" did not preclude the claims regarding the purchase or sale of SIB CDs, which were not publicly traded and thus not "covered" for SLUSA purposes.[9] The case was remanded to district court for further proceedings.[10]

---

[6] In December 2009, the Troice Plaintiffs' case was consolidated with a similar action filed by SIB CD investor Manuel Canabal.

[7] *Roland v. Green*, 675 F.3d 503, 524 (5th Cir. 2012).

[8] 571 U.S. 377, 395–97 (2014).

[9] *Id.*

[10]  In November 2012, Troice and two other individual investors joined the receiver and Investors' Committee in an action bringing investor class claims and receivership estate claims against Stanford's lawyers at the Greenberg Traurig firm. Complaint, *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641-N-BQ (N.D. Tex. Nov. 15, 2012) Dkt. 1. On the defendants' motion for judgment on the pleadings, the district court held that under Texas's attorney-immunity doctrine it lacked jurisdiction over the investor-plaintiffs' class claims, since these plaintiffs were non-clients and the conduct at issue occurred within the scope of the attorney's representation of a client. *Official Stanford Investors Comm. v. Greenberg Traurig, LLP*, 2017 WL 6761765, at *3 (N.D. Tex. Dec. 5, 2017). The district court dismissed Troice's and the other investor plaintiffs' claims against Greenberg Traurig, allowing the

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

In October 2013, Troice and another individual investor, Manuel Canabal, joined the receiver's prosecution of a case against the same insurance brokers. Together with these two individuals and the Investors' Committee, the receiver filed a complaint against Willis of Colorado and its affiliates (collectively "the Willis Defendants"),[11] and a month later amended the complaint to add claims against BMB.[12] In this suit ("the Receivership Action"), Troice and Canabal asserted claims individually and on behalf of a putative class of SIB CD investors. The receiver and the Investors' Committee sought to recover Ponzi-scheme losses on behalf of the estate under six theories:[13]

(1) that Willis and BMB knowingly or recklessly aided, abetted, or participated in the Stanford directors' and officers' breaches of fiduciary duties towards the receivership entities, resulting in exponentially increased liabilities and the misappropriation of billions of dollars;

(2) that Willis and BMB violated their duty of care towards the receivership entities by enabling and participating in the Stanford directors' and officers' Ponzi scheme, resulting in exponentially increased liabilities and the misappropriation of billions of dollars;

---

receiver and Investors Committee to proceed on the estate claims. *Id.* Troice and the investors plaintiffs appealed, and this court affirmed. *Troice v. Greenberg Traurig, LLP*, 2019 WL 1648932, at *1 (5th Cir. Apr. 17, 2019). The receiver and Investors Committee did not participate in the appeal.

[11] The plaintiffs also brought claims against Amy Baranoucky, the Stanford entities' Client Advocate within Willis.

[12] The plaintiffs also brought claims against Robert Winter, the BMB insurance specialist who served on the board of the Stanford International Bank.

[13] The Troice Plaintiffs attacked the Ponzi scheme with claims for violations of the Texas Securities Act ("TSA"); aiding and abetting violations of the TSA; participation in a fraudulent scheme; civil conspiracy; violations of the Texas Insurance Code ("Insurance Code"); common law fraud; negligent misrepresentation; negligence/gross negligence; and negligent retention/negligent supervision.

11

(3) that Willis and BMB were unjustly enriched by proceeds of the Ponzi scheme, paid out to the defendants by Stanford's directors and officers, transfers made with the intent to hinder, delay or defraud the receivership entities; [14]

(4) that Willis and BMB knowingly or recklessly aided, abetted, or participated in the Stanford directors' and officers' fraudulent transfers of receivership entities' assets to third parties, including Stanford's insurers, the recipients of Stanford's investments in ventures and real estate, and Allen Stanford himself, with the intent to hinder, delay, or defraud the receivership entities;

(5) that Willis and BMB breached their duties of care to the receivership entities in their hiring, supervision, and retention of employees who issued comfort letters in furtherance of the Stanford Ponzi scheme, causing exponentially increased liabilities and the misappropriation of billions of dollars;

(6) that Willis and BMB conspired with Stanford directors and officers to use insurance as a marketing tool to sell SIB CDs in furtherance of the Ponzi scheme, harming the receivership entities. The district court dismissed this civil conspiracy claim, however, holding that the receiver and the Investors' Committee failed to allege the requisite state of mind to sustain the claim.

In March 2014, the district court consolidated the Receivership Action and the Original Troice Action for purposes of discovery, keeping the cases on separate dockets.

---

[14] This claim is asserted by the Investors' Committee.

12

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

**D.**

On February 14, 2013, five groups of individual investors (collectively "the Florida Plaintiffs-Objectors") filed lawsuits against Willis entities in Florida state court, seeking compensation for the plaintiffs' alleged Ponzi-scheme losses, in excess of $130 million, under common law theories of negligence and fraud. Willis removed these cases to federal court, where they were transferred to Judge Godbey in the Northern District of Texas. The district court remanded one of the cases to Florida state court for lack of diversity, subject to a stay, and kept the remaining cases.

In 2009 and 2011, two groups of individual investors ("the Texas Plaintiffs-Objectors" collectively) filed lawsuits against Willis entities and BMB in Texas state court,[15] seeking recovery of their alleged Ponzi-scheme losses, in excess of $88 million under the Securities Act of 1933, the Texas Insurance Code, the Texas Securities Act, the Colorado Consumer Protection Act, and common law theories of negligence and fraud. Willis and BMB removed these cases to federal court, where they were transferred to Judge Godbey. In both cases, the district court granted plaintiffs' motions for remand based on procedural defects in removal,[16] but also held that the plaintiffs had violated the Receivership Order's injunction against suits encumbering receivership assets.[17] It held that the cases would remain stayed on remand under the terms of the Receivership Order because, "to the extent Defendants are ever held liable, any proceeds of the claim are potential receivership assets

---

[15] *Rupert v. Winter*, 2012 WL 13102348, at *1 (N.D. Tex. Jan. 24, 2012); *Rishmague v. Winter*, 2014 WL 11633690, at *1 (N.D. Tex. Sept. 9, 2014), *aff'd*, 616 F. App'x 138 (5th Cir. 2015).

[16] *Rupert*, 2012 WL 13102348 at *3–4; *Rishmague*, 2014 WL 11633690 at *2.

[17] *Rupert*, 2012 WL 13102348 at *7; *Rishmague*, 2014 WL 11633690 at *3.

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

. . . . The Court will not condone or allow Stanford investors to race for Receivership assets as the Plaintiffs attempt to do here."[18] In the second of these cases, the plaintiffs appealed the district court's refusal to lift the litigation stay, and this court affirmed, recognizing "[']the importance of preserving a receivership court's ability to issue orders preventing interference with its administration of the receivership property.'"[19]

In 2016, a group of Stanford investors ("the Able Plaintiffs-Objectors") filed a suit against Willis in the district court for the Northern District of Texas under common law and statutory theories, seeking recovery of their alleged Ponzi-scheme losses in excess of $135 million.[20]

**E.**

Meanwhile, the receiver and Investors' Committee continued prosecuting their claims against the Willis Defendants and BMB. After years of litigation, thousands of hours of investigating the claims, and two mediations, the parties to the Receivership Action agreed to terms of settlement—a release of claims against BMB for $12.85 million, to be paid into the receivership and distributed to receivership claimants who held SIB CDs as of February 2009, and a release of claims against the Willis Defendants in exchange for $120 million, also to be paid into the receivership and distributed to claimants holding SIB CDs as of February 2009. Both BMB and the Willis Defendants conditioned their agreement on global resolution of claims arising out of the Stanford Ponzi scheme. Specifically, they conditioned agreement on

---

[18] *Rupert*, 2012 WL 13102348 at *9; *Rishmague*, 2014 WL 11633690 at *4.

[19] *Rishmague v. Winter*, 616 F. App'x 138, 139 (5th Cir. 2015) (unpublished) (quoting *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir.1985)).

[20] The Able Plaintiffs-Objectors also include five individual investors, who would have destroyed diversity in the litigation in the Northern District of Texas, and therefore joined an existing suit by Stanford investors against Willis in Harris County, Texas.

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

the district court entering bar orders enjoining Stanford-Ponzi-scheme-related claims against them. Troice and Canabal do not challenge the settlement, and release any claims except their right to participate in the distribution of the receivership.

In November 2016, the district court gave notice of the settlement to interested parties. In August 2017, the district court approved the settlements and entered the bar orders over the objections of the Florida, Texas, and Able Plaintiffs-Objectors. The Plaintiffs-Objectors appealed.

## II.

## A.

The Plaintiffs-Objectors argue that the district court lacked subject matter jurisdiction to bar claims not before the court. Alternatively, they argue the bar orders were an improper exercise of the district court's power over the receivership. We review the district court's subject matter jurisdiction de novo,[21] and review the settlement for abuse of discretion.[22]

## 1.

In the aftermath of the 1929 financial crash, Congress passed a number of statutes to promote competition and free exchange in our country's securities exchanges and the market for unlisted securities.[23] The "basic purpose" of these laws was "to insure honest securities markets and thereby promote investor confidence."[24] These laws established the SEC, an agency armed "with an arsenal of flexible enforcement powers" to uphold the integrity of securities

---

[21] *See Crane v. Johnson*, 783 F.3d 244, 250 (5th Cir. 2015).

[22] *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982).

[23] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).

[24] *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 390 (2014) (quoting *United States v. O'Hagan*, 521 U.S. 642, 658 (1997)).

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

markets.[25] These same statutes also authorize federal courts' jurisdiction over actions protecting the markets. Specifically, Section 22 of the 1933 Act and Section 27 of the 1934 Act confer jurisdiction on the district courts over enforcement actions, including "suits in equity."[26] The acts grant the SEC access to the courts' full powers, including use of the traditional equity receivership, to coordinate the interests in a troubled entity and ensure that its assets are fairly distributed to investor creditors.[27] These implicit authorizations of receiverships are consistent with the more general express authorization Congress provided in 28 U.S.C. § 3103. Otherwise stated, "[f]ederal equity receiverships, despite the name, have a federal statutory framework."[28]

---

[25] *Ernst & Ernst*, 425 U.S. at 195.

[26] 15 U.S.C. § 77v(a) ("The district courts of the United States . . .  shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto . . . . of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter."); 15 U.S.C. § 78aa(a) ("The district courts of the United States  . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder."); *see also* James R. Farrand, *Ancillary Remedies in SEC Civil Enforcement Suits*, 89 HARV. L. REV. 1779, 1782 (1976) ("[T]he 1933 and 1934 Securities Acts[] have specifically conferred equity jurisdiction on the courts").

[27] *SEC v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986) ("Our court, like many others, has recognized that as part of courts' equitable powers under the Securities Acts of 1933 and 1934, it may impose receiverships in securities fraud actions to prevent further dissipation of defrauded investors' assets."); *cf. SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972) ("It is now well established that Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a) (1970), and Section 27 of the 1934 Act, 15 U.S.C. § 78aa (1970), confer general equity powers upon the district courts."); *Janvey v. Alguire*, 2014 WL 12654910, at *16 (N.D. Tex. July 30, 2014) (collecting cases); *id.* at *17 ("The purpose of federal equity receiverships is . . . to marshal assets, preserve value, equitably distribute to creditors, and, either reorganize, if possible, or orderly liquidate."); *see also* Farrand, *Ancillary Remedies, supra* at 1788 (observing that the equity receivership has been recognized "as one means to effectuate the purposes of a statutory scheme of regulation.").

[28] *Alguire*, 2014 WL 12654910 at *14.

16

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

Exercising their jurisdiction under the securities laws, federal district courts can utilize the receivership mechanism where a troubled entity will not be able to satisfy all of its liabilities to similarly situated creditors.[29] Where the troubled entity is unable to meet its obligations, creditor-investors encounter a collective-action problem: each has the incentive to bring its own claims against the entity, hoping for full recovery; but if all creditor-investors take this course of action, latecomers will be left empty-handed. A disorderly race to the courthouse ensues, resulting in inefficiency as assets are dissipated in piecemeal and duplicative litigation. The results are also potentially iniquitous, with vastly divergent results for similarly situated creditors. So it is that at the behest of the SEC the district court may take possession of the entity and its assets, and vest control in its officer, the receiver.[30] The court empowers the receiver to "stand[] in the shoes" of the troubled entity,[31] allowing him to override holdout creditors and reach decisions for the aggregate benefit of creditors under the court's supervision. If so directed by the court, the receiver will systematically use ancillary litigation against third-party defendants to gather the entity's assets. Once gathered, these assets are used to satisfy liabilities to the entity's creditors, not in a disorderly creditor

---

[29] *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 552–53 (6th Cir. 2006) ("The inability of a receivership estate to meet all of its obligations is typically the sine qua non of the receivership.").

[30] *Atl. Tr. Co. v. Chapman*, 208 U.S. 360, 370–71 (1908); *Crites, Inc. v. Prudential Ins. Co. of Am.*, 322 U.S. 408, 414 (1944) (holding that a receiver is "an officer or arm of the court . . . . appointed to assist the court in protecting and preserving, for the benefit of all parties concerned, the properties in the court's custody pending the foreclosure proceedings"); *Certain Underwriters at Lloyds London v. Perraud*, 623 F. App'x 628, 637 (5th Cir. 2015) (unpublished) ("[A] receiver is 'not an agent of the parties,' and is instead 'considered to be an officer of the court'" (quoting 12 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2981 (2d ed. 2015)).

[31] *Matter of Still*, 963 F.2d 75, 77 (5th Cir. 1992) (describing that a "receiver, stands in the shoes of the failed bank, marshals the assets, and administers a fund").

No. 17-11073

c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

feeding frenzy, but through a court-supervised administrative distribution process.[32] Receivership is thus a substitution of orderly, equitable creditor recovery for the chaos and inefficiency of individualized creditor litigation with its irrational allocation of recoveries—one born of necessity.

For this exercise, the federal district courts draw upon "the power . . . [to] impose a receivership free of interference in other court proceedings."[33] The receivership's role is undermined if creditor-claimants jump the queue, circumventing the receivership in an attempt to recover beyond their pro rata share. Under the securities laws, the district court's power to determine appropriate relief for a receivership is broad.[34] The court's powers include "orders preventing interference with its administration of the receivership property."[35] As we have stated:

> Courts of Appeals have upheld orders enjoining broad classes of individuals from taking any action regarding receivership property. Such orders can serve as an important tool permitting a district court to prevent dissipation of property or assets subject to multiple claims in various locales, as well as preventing

---

[32] *Liberte Capital Grp.*, 462 F.3d at 551 ("The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary.").

[33] *SEC v. Wencke*, 622 F.2d 1363, 1372 (9th Cir. 1980).

[34] *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) ("A district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." (quoting *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986))).

[35] *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985); *SEC v. Stanford Int'l Bank, Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011) (unpublished) ("It is axiomatic that a district court has broad authority to issue blanket stays of litigation to preserve the property placed in receivership pursuant to SEC action.").

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

piecemeal resolution of issues that call for a uniform
result.[36]

These can include stays of claims in other courts against the receivership,[37] and bar orders foreclosing suit against third-party defendants with whom the receiver is also engaged in litigation.[38] Accordingly, at an earlier stage in the litigation we affirmed the district court's order enjoining the Texas Plaintiffs-Objectors' from prosecuting claims against Willis during the pendency of the receiver's action.[39] While that stay was temporary and the bar orders at issue here are permanent, it is of no moment here in the calculus of the court's powers. Indeed, in both cases the district court, through its control of the receivership, enjoins non-party claims in another court—without exercising jurisdiction over them—to protect the receivership.[40]

*SEC v. Kaleta* illustrates this central role of the federal district court.[41] In *Kaleta*, the SEC initiated an enforcement action against Kaleta Capital Management and related entities, alleging a fraudulent scheme.[42] As here, the district court appointed a receiver to take custody of and represent the troubled Kaleta entities.[43] Pursuant to its appointment order, the Kaleta receiver sued the third-party Wallace Bajjali Entities to recoup proceeds of Kaleta's alleged violation of the federal securities laws. After months of investigation and

---

[36] *Schauss*, 757 F.2d at 654 (internal quotation mark and citation omitted); *see also SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010) ("An anti-litigation injunction is simply one of the tools available to courts to help further the goals of the receivership.").

[37] *See Schauss*, 757 F.2d at 653; *Byers*, 609 F.3d at 93; *Liberte Capital Grp.,* 462 F.3d at 551–52.

[38] *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (unpublished).

[39] *Rishmague v. Winter*, 616 F. App'x 138 (5th Cir. 2015) (unpublished).

[40] *Rishmague*, 2014 WL 11633690 at *3.

[41] 530 F. App'x 360 (5th Cir. 2013) (unpublished).

[42] *SEC v. Kaleta*, 2012 WL 401069, at *1 (S.D. Tex. Feb. 7, 2012).

[43] *Id.*

negotiation, the parties reached a proposed settlement, under which the defendants would exchange payment for the receiver's release of claims,[44] conditioned on a bar order enjoining all other claims against the Wallace Bajjali Entities by Kaleta's investor-creditors—non-parties—arising out of the fraudulent scheme.[45] A number of Kaleta investor-creditors objected to the settlement, arguing the district court lacked authority to bar claims not before the court.[46] When the district court approved the settlement and entered the bar order, the objectors appealed. In an opinion drawing upon principles so commonplace that it was not published, we affirmed, holding that the district court's broad powers to fashion relief in the receivership context included the power to enjoin other proceedings by non-parties.[47]

The Tenth Circuit reached a similar conclusion. In *SEC v. DeYoung*, the SEC sued retirement-account administrator APS, and, as here, the district court took custody of the troubled company and appointed a receiver.[48] The receiver then pursued a third party, First Utah Bank, seeking recovery for the Bank's failure to protect APS account holders.[49] The suit between the receiver and First Utah Bank settled,[50] conditioned on the district court's approval of a bar order that would enjoin suits by non-party APS account holders against First Utah Bank.[51] Individual APS account holders objected, arguing the district court exceeded its authority because it barred claims "belong[ing]

---

[44] *Id.* at *2.
[45] *Id.* at *3.
[46] *Id.* at *7.
[47] *Kaleta*, 530 F. App'x at 362 ("Such 'ancillary relief' includes injunctions to stay proceedings by non-parties to the receivership.").
[48] 850 F.3d 1172, 1175 (10th Cir. 2017).
[49] *Id.* at 1176.
[50] *Id.* at 1175.
[51] *Id.* at 1178

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

exclusively to the individual Account Holders" not before the court; the receiver, they argued, lacked standing to assert these claims.[52] The Tenth Circuit disagreed, finding that the receiver had standing to sue First Utah Bank on behalf of the receivership entity and that the court had subject matter jurisdiction to enter the bar order.[53] The court's equitable powers authorized it to bar claims "substantially identical" to those brought by the receiver.[54] The account holders' and receiver's claims were substantially identical because they involved "the same loss, from the same entities, related to the same conduct, and arising out of the same transactions and occurrences by the same actors."[55]

The district court will exercise its "broad equitable power in this area"[56] in accord with the needs of receivership on the particular facts of each case. *Rishmague*, *Kaleta*, and *DeYoung* clarify the breadth and reach of the district court's power to protect the operation of the receivership and its custody of the receivership res. We find them persuasive.

This litigation is one of several ancillary suits under the primary SEC action that enforces the federal securities laws against Robert Allen Stanford and his Ponzi-scheme co-conspirators.[57] There is no dispute that the receiver and Investors' Committee had standing to bring their claims against the Willis

---

[52] *Id.* at 1180–81.

[53] *Id.* at 1181–82.

[54] *Id.* at 1176–83.

[55] *Id.* at 1176.

[56] *SEC v. Posner*, 16 F.3d 520, 521 (2d Cir. 1994).

[57] *Janvey v. Reeves-Stanford*, 2010 WL 11463486, at \*3 (N.D. Tex. Nov. 18, 2010) ("[T]he initial suit which results in the appointment of the receiver is the primary action and . . . any suit which the receiver thereafter brings in the appointment court in order to execute such duties is ancillary to the main suit . . ." (quoting *Crawford v. Silette*, 608 F.3d 275, 278 (5th Cir. 2010)).

21

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

Defendants and BMB. They bring only the claims of the Stanford entities—not of their creditors[58]—alleging injuries only to the Stanford entities, including from the increase in their unsustainable liabilities resulting from the Ponzi scheme. The receiver and Investors' Committee "allege that Defendants' participation in a fraudulent marketing scheme increased the sale of Stanford's CDs, ultimately resulting in greater liability for the Receivership Estate," and that defendants' "harmed the Stanford Entities' ability to repay their creditor investors." The receiver and Investors' Committee sought to recover for the Stanford entities' Ponzi-scheme harms, monies the receiver will distribute to investor-claimants. The district court had subject matter jurisdiction over these claims.

The Plaintiffs-Objectors repeatedly urge that their claims are independent and distinct from those asserted by the receiver and Investors' Committee. The Plaintiffs-Objectors argue that the bar orders entail the district court's assertion of jurisdiction to settle their claims pending in other judicial proceedings. They are mistaken. It is necessarily the case that where a district court appoints a receiver to coordinate interests in a troubled entity, that entity's creditors will have hypothetical claims they could independently bring but for the receivership: the receivership exists precisely to gather such interests in the service of equity and aggregate recovery. While claims seeking recovery for Ponzi-scheme harms can sound in tort, contract, or numerous other causes of action, the harms arise from a singular scheme, not isolated

[58] *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013) ("[A] federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors"); *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) ("[A] receiver does not have standing to sue on behalf of the creditors of the entity in receivership. Like a trustee in bankruptcy or for that matter the plaintiff in a derivative suit, an equity receiver may sue only to redress injuries to the entity in receivership.").

22

acts—that is, from a composite of conduct by numerous conspirators taken over years, collectively establishing and perpetuating the fraud.

The Stanford Ponzi scheme, and Willis and BMB's participation in it, increased the receivership entities' liabilities and misappropriated its funds, such that those liabilities could not be satisfied; SIB CD investors were saddled with the corresponding lost investments. The Stanford International Bank, and hence SIB CD investors—attracted by the promise of high returns plus comprehensive insurance—were injured by these alleged Ponzi players who created, amplified, and maintained the fraud. The Plaintiffs-Objectors seek to recover assets directly from Willis and BMB to compensate lost investments in the Stanford entities; the receiver and Investors' Committee attempt to recover from the same defendants to satisfy corresponding liabilities to investors through the receivership's distribution process. To the point, the claims of the Plaintiffs-Objectors' and those of the receiver and Investors' Committee seek recovery to address the same harms sustained by the same conduct in the same Ponzi scheme.

By entering the bar orders, the district court recognizes the reality that, given the finite resources at issue in this litigation, Stanford's investors must recover Ponzi-scheme losses through the receivership distribution process. The Willis Defendants and BMB contend that the bar orders are preconditions of their respective settlements. The brokers' incentives to settle are reduced— likely eliminated—if each SIB CD investor retains an option to pursue full recovery in individual satellite litigation. Such resolution is no resolution. And the costs of undermining this settlement are potentially large. The receivership—and thus qualifying investor claimants—will be deprived of $132 million in settlement proceeds. Continued prosecution of the receiver and Investors' Committee's suit against Willis and BMB could result in the same if

No. 17-11073

c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

not greater recovery, but this is sheer speculation. Further, any potential value of the receiver's ultimate recovery must be reduced by the costs of prolonged litigation over the same assets, not only in the receiver's own action but also in the Plaintiffs-Objectors' myriad satellite suits, into which the receivership is likely to be drawn. Supposing that Willis, an allegedly deep-pocketed defendant, remains able to satisfy any judgment against it, the same cannot be said of BMB: continued litigation would eat away at the limited funds available under its "wasting" insurance policy.

Our decision is consistent with this court's decision in *SEC v. Stanford International Bank, Limited. (Lloyds)* reviewing bar orders entered by the same receivership court in connection with the Stanford receiver's $65 million settlement with insurance underwriters.[59] The *Lloyds* bar orders enjoined third-party litigation against the defendant underwriters who had settled with the receiver.[60] Our court differentiated the bar orders' effect with respect to two different categories of objectors.[61] While it held that the bar orders improperly enjoined co-insured Stanford officers' non-investment-related suits against the underwriters, the court approved the bar orders relative to investors in Stanford securities, as here.[62] Unlike the co-insured officers, the investors were able to participate in the receivership's distribution process— they "were afforded a means of filing claims apart from the direct action suit, and many . . . availed themselves of that opportunity."[63] The bar order

---

[59] *SEC v. Stanford Int'l Bank, Ltd. (Lloyds)*, 2019 WL 2496901 (5th Cir. June 7, 2019).

[60] *Id.* at *3.

[61] The dissent fails to recognize this distinction in *Lloyds*, and overlooks the only parallel with the instant case: the court's approval of the bar orders as concerned investors who—like the Plaintiffs-Objectors before us—had opportunity to participate in the receivership distribution process.

[62] *Lloyds*, 2019 WL 2496901 at *3, *12.

[63] *Id.* at *12.

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

functioned to channel investors' recovery into the receivership distribution process and "did not interfere with or improperly extinguish the [investors'] rights."[64]

In this appeal we address only the effect of the Willis and BMB bar orders enjoining third-party investors' claims. The receiver initiated suit, negotiated, and settled with the Willis Defendants and BMB while empowered to offer global peace, that is, to deal with potential investor holdouts like the Plaintiffs-Objectors. These holdouts have been content for the receiver to pursue litigation for their benefit, then to participate as receivership claimants, collecting pro rata. Now, however, they ask to jump the queue, come what may to their fellow claimants who remain within the receivership distribution process. At bottom, the Plaintiffs-Objectors seek special treatment: they ask this court to recreate the collective-action problem that Congress sought to eliminate so that they—and no one else—can recover in full. We will not do so. The bar orders—enjoining these investors' third-party claims—fall well within the broad jurisdiction of the district court to protect the receivership res. The exercise of jurisdiction over a receivership is not an exercise of jurisdiction over other judicial proceedings. It rather permits the barring of such proceedings where they would undermine the receivership's operation.

**2.**

"'[T]he district court has . . . wide discretion to determine the appropriate relief in an equity receivership.'"[65] Again, the receivership solves a collective-action problem among the Stanford entities' defrauded creditors, all suffering losses in the same Ponzi scheme. It maximizes assets available to

---

[64] *Id.* at *14.
[65] *Kaleta*, 530 F. App'x at 362 (quoting *Safety Fin. Serv., Inc.*, 674 F.2d at 372–73).

25

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

them and facilitates an orderly and equitable distribution of those assets. Allowing creditors to circumvent the receivership would dissolve this orderly process—circumvention must be foreclosed for the receivership to work. It was no abuse of discretion for the district court to enter the bar orders to effectuate and preserve the coordinating function of the receivership.

**B.**

Under the Anti-Injunction Act, "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."[66] That is, "federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."[67] Guided by principles of federalism, we "find[] a threat to the court's jurisdiction" where "a state proceeding threatens to dispose of property that forms the basis for federal in rem jurisdiction."[68]

The district court exercises jurisdiction over the receivership estate. The particular part of that res at issue here is $132 million receivable owed to the receivership, conditioned upon the BMB and Willis bar orders. When in 2009 the district court took the receivership estate into its custody, the res "[wa]s as much withdrawn from the judicial power of the other [courts], as if it had been carried physically into a different territorial sovereignty."[69] The Plaintiffs-Objectors' suits in state court implicate that same res. The formal distinction

---

[66] 28 U.S.C. § 2283.

[67] *Atl. Coast Line R. Co. v. Bhd. of Locomotive Engineers*, 398 U.S. 281, 295 (1970).

[68] *Tex. v. United States*, 837 F.2d 184, 186 n.4 (5th Cir. 1988); *see Newby v. Enron Corp.*, 302 F.3d 295, 301 (5th Cir. 2002).

[69] *Covell v. Heyman*, 111 U.S. 176, 182 (1884).

26

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

between the Plaintiffs-Objectors' and the receivers' claims against the brokers arises from the receivership's mediating role, interposed by the district court between the investor-creditors and the assets belonging to the Stanford entities. The receiver sues the brokers on behalf of the Stanford entities so that assets owed to creditors can be distributed to them administratively, through the distribution process rather than through their own piecemeal satellite litigations: "any proceeds of the [Plaintiffs-Objectors'] claim are potential receivership assets, falling squarely within the bounds of the Receivership Order."[70]

The bar orders here prevent Florida and Texas state-court proceedings from interfering with the res in custody of the federal district court. The bar orders aided the court's jurisdiction over the receivership entities, which remain in the custody of the court. The bar orders do not violate the Act.

## C.

The Texas and Florida Plaintiffs-Objectors argue that the Willis bar order deprived them of their property (that is, their claims) without due process and without just compensation. This is a recasting of the jurisdictional argument we have rejected. The district court was empowered to bar judicial proceedings not before it to protect the receivership. In so doing, the court afforded the Plaintiffs-Objectors all the process due, notice and opportunity to be heard on the proposed settlement and bar orders—an opportunity they seized. Moreover, they were not deprived of any entitlement to recovery: the bar orders channel investors' recovery associated with BMB and Willis through the receivership's distribution process. As SIB CD investors, Plaintiffs-Objectors were provided notice of the receivership's distribution process; they

---

[70] *Rupert*, 2012 WL 13102348 at *7; *see also Rishmague*, 2014 WL 11633690 at *3.

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

were afforded an opportunity to submit proofs of claim, and to dispute the receiver's disposition of their entitlements within the receivership's administrative distribution process, including judicial review. As described, almost all Plaintiffs-Objectors are participants in that process. The district court's decision to channel the Texas and Florida Plaintiffs-Objectors' recovery into that receivership process as opposed to independent litigation does not deprive them of an entitlement to recover for Ponzi-scheme losses. All due process has been afforded.

**D.**

The Plaintiffs-Objectors challenge the settlement agreements and bar orders, inferring from the large settlement sums that these are "de facto class settlements" entered unlawfully without certification of a settlement class.[71] There is a likeness in function between the receivership and a hypothetical certified SIB CD investor class action: both offer means to pursue litigation in an aggregative form. In the former, the court channels recovery through its officer, the receiver, and retains power to bar parallel proceedings that would interfere. In the latter, creditors pursue their entitlements via class representatives under the requirements of Rule 23. But, as Congress authorizes, the district court appointed a receiver and did not certify an investor class. The Willis and BMB settlements bring monies ultimately to be distributed to all SIB CD investor-claimants through the receivership. There was no illicit class settlement, and the bar orders do not offend Rule 23.

---

[71] The Able Plaintiffs-Objectors also argue that in entering the Willis settlement, the Troice Parties violated their fiduciary duties to members of the putative class of SIB CD investors. The claim fails for the same reason as the other Rule 23 challenges.

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

**E.**

The Texas Plaintiffs-Objectors argue that the bar orders deny their right to a jury trial, retreading the jurisdictional argument we have addressed. Their argument presumes the Objector-Plaintiffs were otherwise entitled to pursue their independent action in state court unconstrained by the receivership court's bar order. We have explained why they have no such entitlement. The right to a jury does not create a right to proceed outside the receivership proceeding.

**F.**

The district court did not abuse its discretion in approving the BMB and Willis settlement agreements. The Texas Plaintiffs-Objectors argue that a "far greater recovery was possible," that the settlement was premature, and SIB CD investors could have recovered 100 percent of their investments. This is at best speculative. The settlement was reached after years of investigation and litigation. There was no certainty in the outcome of the Receivership Action. The defendant brokers contested liability and insist they would continue to do so if the settlements are terminated. It remained for the plaintiffs to prove their claims at trial, including proving the brokers' role in the Ponzi scheme. The potential benefits of continued litigation must be discounted by the risk of failing in that proof or in overcoming defenses, together with attendant costs, mindful that to succeed it would not be enough to prove that the brokers "aided and abetted." The district court considered tradeoffs the parties faced with the prospect of settlement and found the settlements "consistent with interests of both the receivership and the investors." The district court found no evidence of fraud or collusion and did not abuse its discretion in approving the settlements.

29

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

**III.**

The core difficulty with Plaintiffs-Objectors' challenge to the bar of their carve-out suits is that their theory would frustrate the central purposes of the receivership and confound the SEC mission to achieve maximum recovery from the malefactors for distribution pro rata to all investors. We AFFIRM the district court's approval of the BMB and Willis settlements and its entering of the corresponding bar orders enjoining the Plaintiffs-Objectors' third-party investor claims.

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

DON R. WILLETT, Circuit Judge, dissenting:

I share the majority's appreciation for this settlement's practical value. But in my view, the district court lacked jurisdiction to grant the bar orders. The Receiver only had standing to assert the Stanford entities' claims. It could not release other parties' claims, or have the court do so, in exchange for a payment to the Stanford estate. For better or worse, the objecting plaintiffs' claims were beyond the district court's power.

I

Willis of Colorado, Inc., its affiliates, and Bowen, Miclette and Britt, Inc. injured the Stanford entities by failing to thwart the Ponzi scheme.[1] They participated in, or turned a blind eye to, Stanford officers' misdeeds. So the Receiver asserted breach of fiduciary duty and negligence claims against them. But Willis and BMB separately injured the Objectors. They sent the Objectors letters misrepresenting Stanford's soundness and its insurance coverage. So the Objectors asserted fraud and negligent misrepresentation against them. The Objectors' injuries are separate from Stanford's.

II

At its "irreducible constitutional minimum," standing requires that the plaintiff suffered an injury in fact, the injury is traceable to the defendant's actions, and the injury would likely be redressed by a favorable decision.[2] This adversity requirement applies whether the action is equitable or for damages.[3]

---

[1] These facts are taken from the Receiver's and Objectors' pleadings. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

[2] *Id.* at 560–61.

[3] *See Janvey v. Democratic Senatorial Campaign Comm., Inc. ("DSCC")*, 712 F.3d 185, 190 (5th Cir. 2013) (applying standing limitation to the Receiver).

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

I believe the Receiver lacked standing to assert claims for the Objectors' separate injuries.[4] This standing defect is jurisdictional.[5] And it extends to relief like the bar orders. In another recent Stanford case, *SEC v. Stanford International Bank, Ltd. ("Lloyds")*, the Receiver had settled claims against Stanford's director-and-officer insurers.[6] But we vacated the associated bar orders.[7] The court recognized that "[t]he prohibition on enjoining unrelated, third-party claims without the third parties' consent . . . is a maxim of law not abrogated by the district court's equitable power to fashion ancillary relief measures."[8] If no party before the court has standing to assert a claim, the court generally lacks power to dispose of it.[9] Here, the bar orders disposed of the Objectors' claims without their consent and without the procedural protections of a class action.

The Receiver contends that the Objectors' claims are "factually intertwined" with its own. But having defendants in common (Willis and BMB) or having a common destination for the plunder (Stanford officers) does not make claims the same.[10] And the Objectors' right to participate in the receivership claims process does not change this. The receivership claims process pays for Stanford's liability out of Stanford's assets. If third parties like

---

[4] *Id.* ("[A] federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors . . . .").

[5] *E.g.*, *Warth v. Seldin*, 422 U.S. 490, 518 (1975) ("The rules of standing . . . are threshold determinants of the propriety of judicial intervention.").

[6] ___ F.3d ___, No. 17-10663, 2019 WL 2496901, at *1 (5th Cir. June 17, 2019).

[7] *Id.*

[8] *Id.* at *6.

[9] *Cf. Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) (holding plaintiff's claim could not be enjoined because he was not a party to prior action).

[10] *See, e.g.*, *N.Y. Life Ins. Co. v. Gillispie*, 203 F.3d 384, 387 (5th Cir. 2000) (requiring same "nucleus of operative fact" for claim identity).

Willis and BMB injured both the Objectors and Stanford, they are liable to each.

This case is distinguishable from decisions that approved bar orders. In *SEC v. DeYoung*, the Tenth Circuit affirmed a bar order after an investment firm's receiver settled with the firm's former bank.[11] Unlike this case, the receiver had standing to settle individual victims' claims because they were based on the "same conduct" and the "same transactions"[12]—the bank's failure to monitor the firm's accounts.[13] The Tenth Circuit distinguished that situation from *Liberte Capital Group, LLC v. Capwill*, a case where the receivership entities lacked standing to sue a broker for its misrepresentations to investors.[14] In other words, *DeYoung* distinguished its holding from precisely this situation. Our decision in *SEC v. Kaleta* is also distinguishable.[15] It affirmed a bar order but didn't suggest that the settling defendants had made any representations directly to the victims.[16] The bar order was limited to claims from one set of fraudulent notes.[17] All to say, authority for the bar orders here is thin to none.

## III

Besides the lack of standing, the bar orders also do not fit within any affirmative source of federal jurisdiction. At least some of the Objectors' claims

---

[11] 850 F.3d 1172 (10th Cir. 2017).

[12] *Id.* at 1179 (quoting district court findings).

[13] *Id.* at 1182.

[14] *Id.* at 1181 (distinguishing *Liberte*, 248 F. App'x 650 (6th Cir. 2007)).

[15] 530 F. App'x 360 (5th Cir. 2013).

[16] *See id.*

[17] *Id.* at 363 ("[T]he investors continue to retain all other putative claims against the Wallace Bajjali Parties that do not arise from the allegedly fraudulent notes that underlie this action.").

No. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

are state-law claims that could not be removed to federal court.[18] The district court lacked in rem jurisdiction over these claims, as in rem jurisdiction extends only to receivership property.[19] And receivership property consists of Stanford's assets, not its victims' claims.[20]

The district court had no ancillary jurisdiction either. Ancillary jurisdiction extends only to claims by or against the Receiver.[21] So the district court had no jurisdiction to adjudicate these claims. And in my view it had no jurisdiction to permanently enjoin them.[22]

IV

Federal courts cannot decide a claim's fate outside the "honest and actual antagonistic assertion of rights."[23] I would vacate the bar orders.

Respectfully, I dissent.

---

[18] *E.g.*, *Rishmague v. Winter*, No. 3:11-CV-2024-N, 2014 WL 11633690, at *1 (N.D. Tex. Sept. 9, 2014) (remanding some Rupert Parties' claims to state court).

[19] *Cf. Riehle v. Margolies*, 279 U.S. 218, 223–24 (1929) (distinguishing distribution of debtor's property from determination of claims against it).

[20] *See id.*; *Lloyds*, 2019 WL 2496901, at *6 ("[T]he court may not exercise unbridled authority over assets belonging to third parties to which the receivership estate has no claim."); *DSCC*, 712 F.3d at 190 ("[A] federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors . . . .").

[21] *See* 12 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2985 (2d ed. 2018); *see also Lloyds*, 2019 WL 2496901, at *6 (stating power to fashion ancillary relief does not affect prohibition on enjoining unrelated claims).

[22] *See Lloyds*, 2019 WL 2496901, at *6.

[23] *United States v. Johnson*, 319 U.S. 302, 305 (1943) (quoting *Chi. & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892)).

34